UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

T&M INVENTIONS, LLC,

        Plaintiff,

v.                                        Case No. 14-CV-947

ACUITY BRANDS LIGHTING, INC. et al.,

        Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

Plaintiff T&M Inventions, LLC ("T&M") brought this interference action under 35 U.S.C. § 291 (pre-America Invents Act)[1] against Defendants Acuity Brands Lighting, Inc. and ABL IP Holding LLC (together "Acuity"), seeking to invalidate U.S. Patent No. 8,793,944 held by Acuity (the '944 Patent). T&M's claims were tried to the Court October 26–28, 2015. The parties filed post-trial briefs and the case is ready for decision. For the reasons below, I find T&M is entitled to the relief it seeks and judgment will therefore be entered that the '944 Patent is invalid.

## BACKGROUND AND PLAINTIFF'S CLAIMS

This is an inventorship dispute concerning an improved system for mounting skylights and other loads to the roofs of metal buildings. T&M filed this lawsuit alleging that its members Michael J. McLain and Timothy Pendley, who are long-time employees of Bay Industries, Inc. and Bay Insulation Systems, Inc. (together "Bay"), first conceived the invention at issue in the Fall of 2006,

---

[1] The parties agree the pre-America Invents Act version of § 291, entitled "Interfering Patents," applies to this case, as the interfering patents were filed before March 16, 2013. Pub. L. 112-29, §§ 3(h), (n), Sept. 16, 2011, 125 Stat. 288, 293. All subsequent references to title 35 of the United States Code are to the pre-AIA version of the statute cited.

months before Bay entered into a distributorship agreement with Sunoptics Prismatic Skylights ("Sunoptics") for the sale of skylights in connection with metal building fabrication. Sunoptics was a California skylight manufacturing company owned by Jerome "Jerry" Blomberg and his sons Jim and Tom Blomberg. T&M alleges Pendley and McLain began looking for a manufacturer of the "parts and pieces" for their invention in late 2007. T&M alleges Pendley and McLain first offered the opportunity to their employer, Bay, which ultimately declined the offer but authorized Pendley and McLain to independently pursue commercial opportunities for the invention. Pendley and McLain then offered Sunoptics the opportunity to manufacture the invention. T&M alleges Sunoptics expressed interest and permitted Pendley, who lived in Madera, California, some two hours from Sunoptic's Sacramento facility, to build a full-scale mock-up on Sunoptics' property for the purpose of finalizing production specifications and drawings, and to allow for photographs to be taken for installation manuals and marketing materials. The assembly of the mock-up took place in March and April 2008 directly outside the office of Jerry Blomberg and with the assistance of Sunoptics employee Scott Weaver. T&M alleges Weaver made no inventive contribution to Pendley and McLain's invention.

In April 2008, T&M alleges Pendley and McLain met with Sunoptics representatives to view the assembled mockup of the invention. After the viewing, T&M alleges Tom Blomberg told Pendley that Jerry Blomberg was going to patent McLain and Pendley's invention. According to T&M, Pendley and McLain were upset but felt they owed a duty to their employer, Bay, not to overreact and damage the contractual relationship between Bay and Sunoptics. Later that evening, T&M alleges McLain told Sunoptics representatives that at the very least, Pendley's name would be on any patent application, and Jerry Blomberg agreed.

2

A provisional patent application was filed in October 2008 naming Jerry Blomberg and Pendley as co-inventors. A non-provisional application was filed October 2009 (the '176 Application) naming Jerry Blomberg, Pendley and McLain as co-inventors, but still not Weaver. T&M alleges the three named co-inventors entered into an agreement pre-filing of the '176 Application to assign their rights to the invention to a single entity. That entity was to grant Sunoptics the exclusive rights to manufacture and Bay the exclusive rights to sell the invention. Ultimately, however, the parties were unable to come to agreement on the nature of the entity to which they were to assign their rights and how they would divide the profits. In November 2010, T&M alleges Sunoptics paid T&M approximately $20,000 on over $200,000 worth of sales of the invention claimed in the '176 Application.

On February 23, 2011, Sunoptics was acquired by Acuity. Acuity also acquired Jerry Blomberg's rights to the '176 Application. After a series of failed attempts to negotiate a royalty on future sales with Acuity, T&M chose to seek independent patent protection of Pendley's and McLain's contributions to the invention claimed in the '176 Application. T&M filed applications that would issue as U.S. Patent Nos. 8,438,798, 8,438,799, 8,438,801, and 8,763,324 (the T&M Patents). Acuity likewise filed an application that would become the '944 Patent, in which Jerry Blomberg and Scott Weaver were named as co-inventors.

T&M asserts its patents interfere with the '944 Patent and that Pendley and McLain are the sole inventors of the subject matter claimed in the patents at issue. T&M further contends that because Pendley and McLain conceived the invention before Blomberg and Weaver, T&M has priority over Blomberg and Weaver. Accordingly, T&M seeks judgment declaring that the T&M Patents and '944 Patent are interfering patents and that the '944 Patent is invalid.

3

## LEGAL STANDARDS

"[T]he first step in any interference proceeding under § 291 is the evaluation of whether an interference-in-fact exists under the two-way test." *Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 934 (Fed. Cir. 2003). The "two-way test" has been described as follows: "for two claims to interfere, each claim must anticipate or render obvious the other; failure of either claim to anticipate or render obvious the other defeats the test for interfering patents." *Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.*, 655 F.3d 1291, 1302 (Fed. Cir. 2011).

When patents interfere, the "presumption of validity" does not apply and the plaintiff's burden to prove invalidity is by a preponderance of the evidence. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1169 (Fed. Cir. 2006). A patent is invalid if the named inventor did not invent the subject matter claimed in the patent but instead "derived" the invention from another. 35 U.S.C. § 102(f); *Creative Compounds, LLC v. Starmark Laboratories*, 651 F.3d 1303, 1313 (Fed. Cir. 2011). Establishing derivation requires proving "prior conception of the invention by another and communication of that conception to the patentee." *Creative Compounds*, 651 F.3d at 1313 (quoting *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1334 (Fed. Cir. 2003)).

A patent is also invalid if another establishes "priority of invention" over the named inventor. 35 U.S.C. § 102(g). "Priority goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993). If parties simultaneously reduce an invention to practice, priority goes to the party who was the first to conceive. *McParland v. Beall*, 45 App. D.C. 162, 165 (D.C. Ct. App. 1916).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

At trial, Acuity did not contest T&M's contention that the T&M's Patents interfered with the claims of the '944 Patent. Indeed, it is clear that the patents at issue claim the same invention. Specifically, I find Claim 1 of T&M's '798 Patent interferes with Claims 1–9 of the '944 Patent; Claim 1 of T&M's '799 Patent interferes with Claims 1–9 of the '944 Patent; and Claim 1 of the '324 Patent interferes with Claims 1, 2, 3, 5, and 9 of the '944 Patent. Am. Compl. ¶ 46, ECF No. 6; Pl.'s Exs. ("PX") 1 ('798 Patent), 2 ('799 Patent), 5 ('944 Patent); Defs.' Ex. ("DX") 1051 ('324 Patent).

Because the evidence at trial further showed that the alleged inventors reduced the invention to practice in collaboration with each other—i.e. by Pendley's building a mockup of the invention on Sunoptics' property in early 2008—the issue of who was first to conceive is dispositive. *McParland*, 45 App. D.C. at 165. "Conception" means "the completion of the mental part of invention. It is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice. . . . Because [conception] is a mental act, courts require corroborating evidence of a contemporaneous disclosure that would enable one skilled in the art to make the invention." *Burroughs Wellcome Co. v. Barr Laboratories, Inc.*, 40 F.3d 1223, 1227–28 (Fed. Cir. 1994) (internal citations and quotations omitted).

T&M presented convincing evidence that Pendley and McLain conceived the invention as early as October 2006 and no later than June 4, 2007. Specifically, Pendley testified at trial that the idea for the invention was inspired during his first visit to Sunoptics' facility on October 26, 2006. By way of background, Pendley met Jim Blomberg in Las Vegas at a trade show for metal building

5

contractors in September 2006. Pendley was impressed with the quality of Sunoptic's skylights, and Jim Bloomberg invited Pendley to visit Sunoptics' operations and discuss a possible partnership under which Bay might use its position in the metal building industry to sell Sunoptics' high quality skylights. An exclusive distributorship agreement to that effect was later executed on May 1, 2007. PX 28. The agreement reached by the parties contemplated that the skylights would be mounted to metal roofs in the then conventional manner using a bulky apparatus, sometimes prone to leakage and other problems, called a "curb." The invention at issue in the case involves a way of mounting a skylight to a standing seam metal roof without a curb.

Pendley testified that on the way to or back from lunch with Jim Blomberg on his first visit to Sunoptics, Jim pulled over the car to show Pendley some skylights Sunoptics had installed on a building at an airport. Pendley testified that he could immediately see an application for Sunoptics' skylights whereby the skylight would be fastened directly to the "ribs" of a "standing seam roof," a standard type of roof used in the metal building industry with which both Pendley and McLain had considerable experience. Pendley testified that he did not mention his idea to Jim Blomberg because the roof they were looking at was not a standing seam roof but a "screw-down" roof, and Pendley did not believe Blomberg would understand. Pendley testified that after leaving Sunoptics that day he immediately called McLain, his friend and supervisor at Bay. Pendley testified that he described the idea to McLain and McLain, who also had considerable experience in the metal building industry, immediately understood. McLain later testified that he formed a mental picture in his mind during this conversation with Pendley, and that he also sketched what he was visualizing at the time, but did not keep the sketches.

Pendley testified that he later built a prototype of the invention in his home shop in California.

6

The prototype is a piece of aluminum bent in the shape of what Pendley thought would work as what later became a "side rail" for attaching the skylight to the rib of the metal roof. PX 299. Pendley testified that he called the metal piece the "adapter trim" at the time. Trial Tr. 104, ECF No. 31. Pendley thought he likely built the prototype in May 2007, which was when he had turned his attention from the finalization of the Bay-Sunoptics distributorship contract back to the concept he and McLain had come up with for a "curbless" skylight.

Pendley testified in June 2007 he created two drawings of the invention. PX 31. The first, labeled "Side Adapter Trim," shows a side profile of what Acuity concedes is an embodiment of the invention claimed in the '944 Patent. The drawing is strikingly similar to Figure 8 of the '944 Patent, which was included in each T&M Patent. Other notations on the first drawing indicate dimensions and specify parts. Specifically, the drawing shows the side rail fastened to raised rib elevation of the standing seam roof with a rivet labeled "VP 200 RIVET," which Pendley testified referred to a "Varco Pruden" brand "bulb rivet." Tr. 118. The second drawing shows a bird's eye view of a single roof panel with a skylight mounted on it. Tr. 128. Both drawings are labeled "Strip Light," initialed "TP," and dated June 4, 2007, which is the date Pendley testified that he created the drawings.

Acuity does not argue Pendley's first drawing is not definitive evidence of full conception of the invention claimed in the patents at issue. It clearly is. Instead, Acuity argues the drawings are mis-dated and that they were actually created by Pendley in June 2008, at which time CAD drawings were being prepared by a Sunoptics draftsman for the purpose of filing the October 2008 provisional application that would name Jerry Blomberg and Tim Pendley as co-inventors. In support of this theory, Acuity primarily relies on an email composed by McLain in October 2011 in

7

which McLain stated that the Pendley and Jim Blomberg drive that inspired the idea for the invention took place in the fall of 2007, not 2006. DX 1040. McLain's email was in response to an attorney's request for a timeline of important events relating to the invention. More specifically, the request was made by an attorney for a metal building manufacturing company, Bluescope Buildings North America, which by 2011 had entered into an exclusive licencing deal with T&M to manufacture the invention. The email stemmed from Bluescope's discovery that Acuity was making products believed to be covered by T&M's then-pending applications. Acuity argues that because of Bluescope's agreement with T&M, McLain had a strong incentive to get the date of the original inspiration for the invention correct. Acuity also points to a lack of evidence that the Pendley drawings ever surfaced before litigation commenced between these parties, and it points to deposition testimony in which Pendley said the drive occurred in spring or late winter 2007 and McLain said the drive occurred in February or March of 2007.

Despite Pendley's early errors in providing an accurate timeline, I have little difficulty concluding the Pendley drawings are accurately dated. The fact that McLain provided the incorrect date in the Bluescope email in 2011 or that neither McLain nor Pendley could remember the date of the drive in their depositions years later is not surprising given the amount of time that had elapsed. That the drawings did not surface earlier is also not surprising given the relative simplicity of the invention and the ease with which the evidence showed either Pendley or McLain was able to reproduce drawings of it, sometimes on napkins. Pendley testified convincingly that he would not have included the labels included on the drawings and some of the dimensions shown if he created them in June 2008. By June 2008, Pendley had already built a full-scale mockup of the invention on Sunoptics' property. The "side adapter trim" had become a "side rail," and he had long realized that

8

he would need "a much larger, more robust rivet" than the "VP 200." Tr. 117–18, 120.

Also, the date on the drawings was consistent with Pendley and McLain's entire conception story, which itself was corroborated by extensive documentation. For example, Pendley's attendance at the metal building trade show in Las Vegas in September 2006 was corroborated by the report he submitted to Bay for his work related expenses. PX 11A-38. Pendley's testimony that he met with Jim Bloomberg at the Sunoptic plant the next month was corroborated with a confirming email. PX 14. Pendley and McLain were able to tie further discussions and Pendley's detailed drawings of the invention to a group motorcycle trip in California from June 8 to June 10, 2007, in which they roomed together. McLain testified that these conversations could not have taken place during a similar trip in June 2008 because McLain had to pull out of the 2008 trip at the last minute due to the death of his mother. Tr. 265. McLain also testified that he presented the opportunity to manufacture the "parts and pieces" for the invention to Bay, their own employer, a few months after the distributorship agreement with Sunoptics was executed, and that Pendley met with an engineer friend who worked for a metal building manufacturer in October 2007 to discuss whether the invention would work. It was only after Bay declined their offer that Pendley and McLain offered Sunoptics the opportunity to make the "parts and pieces" in December 2007.

Although the parties dispute what was really said at the December meeting, T&M presented third-party testimony corroborating the earlier two events. Bay President Daniel Schmidt testified that McLain offered Bay the opportunity to make the invention "four or five months" after he (Schmidt) signed the distributorship agreement on behalf of Bay. Carl Lewis and Mark Henry, the former a Bay employee and the latter Pendley's engineer friend, each testified that they were present for the October 2007 meeting in which Pendley described the invention to them in detail. Finally,

9

both McLain and Pendley made notes concerning the invention on the hotel receipts they later submitted to Bay with their expense reports for the trip. PX 67, 71. The detail in the notes made by Pendley, in particular, make clear that they were made subsequent in time to the June 4, 2007 drawings he prepared. PX 71. Together, the hotel receipts provide further corroboration for T&M's version of the key events. Importantly, these receipts were submitted by Pendley and McLain to Bay's personnel office before any dispute arose between the parties and remained in Bay's custody until long after litigation between the parties ensued. Based on all of the evidence presented, I find that Pendley and McLain conceived of the invention as early as October 2006 and no later than June 4, 2007.

Acuity does not argue the inventors named in the '944 Patent—Jerry Blomberg and Scott Weaver—conceived the invention by or before June 2007. It thus follows from my conclusions that Pendley's drawings were accurately dated and that Pendley and McLain's conception story is credible that T&M has established Pendley and McLain were first to conceive and are entitled to priority of invention. For that reason, I find the '944 Patent is invalid under § 102(g). My finding that Pendley and McLain were the first to conceived of the invention finds further support, however, in my finding that Acuity's claim that Jerry Blomberg and Weaver are the true inventors is not credible.

Neither Blomberg nor Weaver testified convincingly as to the conception of the invention and, unlike T&M, Acuity offered no documentary and third-party evidence corroborating the alleged inventors' testimony. It is important to note that neither Blomberg nor Weaver had any prior experience with standing seam metal roofs before Sunoptics entered into the distributorship agreement with Bay. Although Sunoptics had installed, or its skylights had been installed, on metal

10

roofs, there is no evidence that these were standing seam metal roofs. Pendley and McLain, in contrast, spent their entire careers working with standing seam roofs and metal curbs. McLain had spent twenty-five of his thirty-nine year career working for Varco Pruden and Butler Manufacturing, the two most prominent manufacturers of standing seam metal roofs. McLain worked specifically with a seamed-in skylight product and dealt with warranty problems related to cutting holes in the roofs. Pendley likewise had extensive experience in the metal building industry and spent years manufacturing and erecting metal buildings. Thus, they had far more familiarity with the problems associated with the traditional way of installing skylights onto metal roofs.

Blomberg, like McLain and Pendley, offered different versions of the key events. But unlike McLain and Pendley, Blomberg did not change his story based on a more complete and careful consideration of the documentation and other corroborating evidence. Blomberg offered no such evidence. His version seemed to change in response to T&M's evidence that provided more and more corroboration to the claim of McLain and Pendley that they first conceived of the invention. Blomberg initially claimed that the first discussion regarding the invention occurred in late 2007 or early 2008. PX 242, ¶ 13. Indeed, Blomberg claimed that he had Weaver fabricate prototype rails and create mock-ups of the invention in Sunoptic's shop. *Id.* Not even Weaver's testimony credibly supports this story. Though Weaver did testify at trial that he made some parts of the invention in his shop, he also testified, consistent with Pendley and McLain, that Pendley erected the mock-up and gave Weaver instructions on the dimensions of the metal pieces that he needed Weaver to cut. Trial Tr. 583:15–585:04. Weaver was often less responsive than Pendley desired because he was devoting all of his time in the spring of 2008 to manufacturing and putting out bids for curbs. Trial Tr. 606:17–607:06.

11

Later, Blomberg, who passed away in 2014, testified by deposition that he conceived of the invention in the fall of 2007. Blomberg testified that Pendley had reported around the time the Bay-Sunoptics agreement was executed that metal building contractors would not be interested in buying skylights without curbs. To satisfy Pendley and enable Sunoptics to manufacturer a skylight and curb package for sale to such contractors, Blomberg testified that he bought over $100,000 worth of curb-making equipment, which was delivered to Sunoptics by June 2007. A few months later, however, Blomberg said Pendley reported that there was not even a market for skylights and curbs. Blomberg testified that it was this news that caused him to immediately start "going back over concepts we had thought about and developed or partially developed in the past on these metal roofs" and come up with the invention. 9/19/2013 Dep. Tr. at 33, ECF No. 47.

The evidence showed, however, that Sunoptics was using its curb-making equipment well into 2008 at a pace that left Weaver time for little else, including helping Pendley on the mock-up he constructed in March and April of 2008. Weaver testified that at no time in 2007 were the shear and press brake Sunoptics purchased in June of that year not in use making curbs for the skylights they sold. Trial Tr. 561:14–562:13. In truth, there is no credible evidence that Blomberg was suddenly confronted with a need to design a new way of mounting Sunoptics' skylights in the Fall of 2007 in order to avoid wasting the money he had already spent on metal fabricating equipment.

Blomberg also testified that he conceived the invention while Pendley was on a drive with Jim Blomberg viewing Sunoptics' skylights in the field. *Id.* at 33:8–9. When Pendley returned, Blomberg apparently told Pendley about the idea, because Blomberg testified they then had a disagreement about whether to fasten the side rail to the inside or outside of the rib of the roof, with Pendley preferring the outside mount and Blomberg preferring the inside mount. *Id.* at 34.

12

Scott Weaver's testimony matched Blomberg's later timeline in ways that are more suspicious than compelling. Weaver, who sat through the whole trial and who was the last witness to testify, said that he first met Pendley on the day Pendley and Jim Blomberg had gone for "the drive"; that he and Pendley started talking about Pendley's experience in the metal building industry; and that the conversation turned to how to specifically mount Sunoptics' skylights on metal roofs. Weaver then testified that he was explaining to Pendley how Jerry Blomberg had installed the skylights on metal roofs in the past, and that Weaver had always thought Jerry's "design" was cumbersome and expensive. So Weaver suggested, "why can't we just attach it to the ribs of the roof and make a curb that way?" According to Weaver, Pendley responded, "that's a great idea." Tr. 513:7–13. Weaver said Jerry then entered the conversation and suggested mounting the side rail to the inside of the rib. *Id.* at 513:15–20. Weaver denied that Pendley gave any indication that he had already thought of these things, but Weaver testified that Pendley did mention "he knew a guy he was going to have a meeting with in the next month or so" and that Pendley suggested he could ask this person (Mark Henry) whether such a design would hurt the structure of the roof. Tr. 514:9–13. In court, Weaver later drew two versions of the mental picture he claimed to have in his mind at the time.

In the end, Acuity's version of events is not credible. If Jerry Blomberg and Sunoptics ever previously devised a "curbless" method of installing skylights on metal roofs, there is no evidence of such a method in the record other than Blomberg's vague testimony about concepts "partially developed in the past" and Weaver's similarly vague testimony about Jerry's cumbersome "design." Their testimony about what they each conceived immediately after Pendley reported that there was "no market" for curbs is also vague and entirely unsupported. Without corroborating evidence

13

(contemporaneous drawings, third-party testimony, etc.) there is no reason to believe Blomberg or Weaver had a definite and permanent mental picture of the complete and operative invention at the time. Moreover, it far more likely that Pendley and Jim Blomberg went on "the drive" (i.e., the one in which everyone agrees Jim showed Pendley skylights at an airport building, and Pendley returned to Sunoptics very enthusiastic about the skylights) in the Fall of 2006, before Bay had entered into the distributorship agreement with Sunoptics than after. Finally, the evidence shows that the only trip Pendley made to Sunoptics during the Fall of 2007 was with McLain, and the Blomberg/Weaver story fails to account for McLain's presence.

Much more credible is the testimony of Pendley and McLain describing their reaction when Tom Blomberg let slip that Jerry intended to patent their invention after Pendley had completed the mock-up in April 2008. Blomberg made no effort to dispute McLain's contention that Pendley was the true inventor that deserved to be named on the patent, but immediately acquiesced in their demand. Blomberg also made no mention of any role that Weaver played. It appears for the sake of loyalty to their employer that McLain and Pendley were willing to share their invention with Blomberg despite the absence of any contribution by him, but as events transpired, even this was not enough for Jerry Blomberg. He wanted more.

For all of these reasons, I conclude that Blomberg and Weaver are not inventors of the invention claimed in the '944 Patent. Blomberg simply derived the invention from Pendley and McLain, whether in December 2007 in connection with the offer to Sunoptics to manufacture the invention, or thereafter while Pendley was building a mockup of the invention on Sunoptics' property. In sum, I find the T&M Patents and the '944 Patent interfere, and further that the '944 Patent is invalid because Blomberg and Weaver derived the invention from Pendley and McLain and

14

because Pendley and McLain were first to conceive in any event.  Although T&M has also sought injunctive relief, there has been no showing that the four-factor test for issuing injunctive relief warrants such relief.  *See eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 392–93 (2006) (holding that four-factor test for issuance of permanent injunction applies in patent cases).

**IT IS THEREFORE ORDERED** that the Clerk enter judgment forthwith that the T&M Patents and  U.S. Patent No. 8,793,944 are interfering patents and that U.S. Patent No. 8,793,944 is invalid pursuant to 35 U.S.C. § 291.

**SO ORDERED** this  1st   day of June, 2016.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
